UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

NATIONAL TRUST INSURANCE
COMPANY,

        Plaintiff,

v.                                CASE NO. 3:18-cv-1440-J-34JBT

COLUMBIA NATIONAL INSURANCE
CO.,

        Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion for Final Summary Judgment ("Motion") (Doc. 38) and Plaintiff's Response thereto (Doc. 44). The Motion was referred to the undersigned for a Report and Recommendation regarding an appropriate resolution. (Doc. 48.) For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED** as to Plaintiff's bad faith claims (Counts I and II) and **GRANTED** as to Plaintiff's claim for punitive damages (Count III).

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

## I.     Background[2]

On October 27, 2015, James Tennant was involved in an automobile accident with a tractor-trailer operated by Thomas Love, an employee of Handi-House Manufacturing Co. ("Handi-House").  (Doc. 7 at 3.)  At the time, Handi-House and Mr. Love were covered by three liability insurance policies providing total coverage of $11 million, which were structured as follows: the primary policy for $1 million with Defendant Columbia National Insurance Company ("Columbia"); the first excess policy for $5 million with Plaintiff National Trust Insurance Company ("National"); and the second excess policy for $5 million with Travelers Insurance Company.  (*Id.* at 2; Doc. 7-1; Doc. 7-2; Doc. 7-13.)

On August 30, 2016, Mr. Tennant filed suit against Handi-House and Mr. Love in Florida state court and alleged that he suffered, among other things, a traumatic brain injury as a result of the accident.  (Doc. 7-3.)  His wife, Stephanie Tennant, also brought a loss of consortium claim.  (*Id.* at 13.)  Columbia initially retained Sorena Fallin, Esq. to defend Handi-House and Mr. Love, and it later retained George Hatch III, Esq. as well.  (*See* Doc. 7-6; Doc. 38-5 at 1–2.) After the case was removed to this Court, the Tennants added a loss of consortium claim by Mr. Tennant's minor child.  (*See* Doc. 7-4.)[3]  The Tennants ultimately demanded

---

[2] To the extent any of the following facts are in dispute, they are viewed in the light most favorable to National as the non-moving party.  *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

[3] *See Tennant v. Handi-House Mfg. Co.*, Case No. 3:16-cv-1276-J-25MCR (Doc. 28 at 9–10).

the full $11 million in liability insurance coverage to settle all three claims.  (Doc. 38-5 at 6.)

It is undisputed that Mr. Tennant's claim had the largest potential value of the three claims.  Specifically, Mr. Tennant presented Columbia with a life care plan valued at nearly $9 million, and the Tennants served proposals for settlement demanding approximately $7 million for Mr. Tennant's claim, $2 million for Mrs. Tennant's claim, and $1 million for the minor child's claim.  (*See* Doc. 44-4 at 24–25, 28–29.)

There were numerous highly contested issues in the underlying suit regarding liability, causation, and damages for all claims.  (*See generally* Docs. 38-5 & 38-7.)  Although Columbia recognized that Mr. Tennant's claim could be extremely valuable if he prevailed at trial as to all issues, it also recognized that he may have been largely at fault for the accident, that he may not have been injured at all in the accident, and that his psychological/behavioral problems may have preceded the accident and not been the result of the alleged brain injury.  (*See id.*)

For example, Columbia was aware of a witness who may have testified that Mr. Tennant actually sped up before the collision rather than slowing down to avoid it.  (*See* Doc. 38-5 at 2; Doc. 38-7 at 9.)  Additionally, Mr. Tennant refused treatment at the scene of the accident, and first responders stated that he was not injured.  (*See id.*)  Further, there were indications that Mr. Tennant was violent and abusive toward his two ex-wives to whom he was married prior to the accident.

3

(*See* Doc. 45-1 at 100–01.)

In April and May 2017, approximately two months prior to Mrs. Tennant's deposition on July 7, 2017, Columbia informed National that it intended to settle Mrs. Tennant's consortium claim for its remaining policy limits of $999,325 and withdraw its defense of the insureds.[4] (*See* Doc. 7-5; Doc. 38-5 at 6; Doc. 38-7 at 25.)[5] On September 13, 2017, Columbia offered to settle all of the subject claims for its remaining policy limits. (Doc. 38-9.) The offer was rejected. (Doc. 38-10.) Thereafter, on September 22, 2017, Columbia offered its remaining policy limits to settle only Mrs. Tennant's consortium claim. (*See* Doc. 38-11.) This offer was accepted on October 25, 2017, and Columbia then withdrew its defense of the insureds. (*See id.*; Doc. 38-12; Doc. 7-11.)

National then took over the defense of the remaining claims. (Doc. 7 at 7.) Following a jury trial, Mr. Tennant was found to be 60% at fault for the accident,

---

[4] Columbia previously paid a small property damage claim which reduced the remaining policy limits from $1 million to $999,325. (Doc. 44-2 at 24–25.)

[5] A letter authored by Mr. Hatch, one of Columbia's attorneys, and one of National's claim notes also mention the minor child's claim when discussing the potential settlement of Mrs. Tennant's claim at that time. (Doc. 7-6 at 3–4; Doc. 38-7 at 22.) However, both Columbia's and National's other claim notes indicate that the proposed settlement was for only Mrs. Tennant's claim. (Doc. 38-5 at 6; Doc. 38-7 at 25.) This was also confirmed in a letter authored by National's adjuster, Donald Nikolas. (Doc. 7-5.) Columbia's adjuster, Preston Burroughs, could not recall during his deposition if he was also trying to settle the child's claim at that time. (*See* Doc. 38-15 at 4, 7, 16.) It does not appear that a formal offer to settle both Mrs. Tennant's and the child's claims for policy limits was ever made. Thus, viewed in the light most favorable to National, the evidence indicates that the proposed settlement discussed in April and May 2017 was for only Mrs. Tennant's claim.

and his total damages were assessed at $1,125,000.[6]  (*Id.* at 7–8.)  Thus, a judgment was entered in his favor for $450,000.  (*Id.*)  In addition to resolving Mr. Tennant's judgment and taxable costs for a total of $520,000, National incurred $556,000 in defense costs in the underlying action.  (Doc. 7-14 at 3.)

National then brought the instant action against Columbia alleging the following claims: Common Law Bad Faith – Subrogation (Count I); Statutory Bad Faith Pursuant to Section 624.155(4), Florida Statutes (Count II)[7]; and Punitive Damages Pursuant to Section 624.155(5), Florida Statutes (Count III).  (Doc. 7.) In support of its claims, National argues primarily that Columbia settled, and overpaid, Mrs. Tennant's consortium claim in bad faith to avoid incurring further defense costs in the underlying action.  (*See* Doc. 44.)  National seeks damages in the amount of $1,076,000, consisting of the amount paid to satisfy the judgment plus defense costs in the underlying action, along with attorneys' fees and costs incurred in this case, and punitive damages.  (*See* Doc. 7.)  Columbia now moves for entry of summary judgment on all three counts.  (Doc. 38.)

## II.   Legal Principles

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

---

[6] The minor child did not recover anything because the jury did not find Mr. Tennant to be permanently disabled.  (Doc. 7-14 at 3.)

[7] Although not pled as such, it appears that this claim is also based on subrogation.

5

material fact and the movant is entitled to judgment as a matter of law."  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant."  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all

6

evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

###    B.    Bad Faith Under Florida Law[8]

"Under the doctrine of equitable subrogation, an excess insurer has the right to maintain a cause of action for damages resulting from the primary insurer's bad faith . . . .   In effect, the excess insurer stands in the shoes of the insured and succeeds to the rights and responsibilities that the insured would normally have against the primary insurer." *Auto-Owners Ins. Co. v. Am. Yachts, Ltd.*, 492 F. Supp. 2d 1379, 1383 (S.D. Fla. 2007) (citations and quotations omitted).

As the Eleventh Circuit has explained:

> Florida law provides a cause of action for bad faith against an insurer both statutorily [pursuant to section 624.155, Florida Statutes] and at common law. . . .[9]
>
> The Florida Supreme Court has set forth an insurer's duty of good faith, which obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the

---

[8] Florida substantive law governs Plaintiff's claims in this diversity action.  *See Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011).

[9] "Whether [the bad faith] claim is pursued under Florida's common law or the statutory scheme, the standard is the same . . . ." *Eads v. Allstate Indem. Co.*, Case No. 14–CIV–61791–Bloom/Valle, 2016 WL 3944072, at *12 (S.D. Fla. Jan. 26, 2016).

insured of any steps he might take to avoid [the] same. The duty also requires the insurer to investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

The standard of care that an insurer must exercise in handling claims against its insured is the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. The insurer must therefore make decisions in good faith and with due regard for the interests of [its] insured. When multiple claims arise from a single accident, the insurer may enter into reasonable settlements with chosen claimants, even if those settlements fully exhaust the policy limits, leaving one or more claimants without recourse against the insurer, so long as the insurer's decision to do so is reasonable and within the purview of its duty of good faith.

Under Florida law, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the totality of the circumstances standard. The question of whether this standard has been met is ordinarily for the jury to decide. Whether the insurer acted with reasonable diligence and ordinary care are ordinarily factual considerations to be decided by a jury; these considerations are material in determining whether an insurer acted in bad faith. Finally, a valid bad faith claim requires a causal connection between the damages claimed and the insurer's bad faith.

*Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358–59 (11th Cir. 2015)

(citations and quotations omitted).

In *Farinas v. Florida Farm Bureau General Insurance Company*, the court explained the duties of an insurer in a multiple claim situation as follows:

8

> Farm Bureau was required by [*Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980)]  to fully investigate all the claims at hand to determine how to best limit the insured's liability. Additionally, based on [*Liberty Mut. Ins. Co. v. Davis*, 412 F.2d 475 (5th Cir. 1969)], Farm Bureau should have sought to settle as many claims as possible within the policy limits.  Finally, based on [*Shuster v. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Trust*, 591 So. 2d 174 (Fla. 1992)], Farm Bureau had the duty to avoid indiscriminately settling selected claims and leaving the insured at risk of excess judgments that could have been minimized by wiser settlement practice.   Whether Farm Bureau satisfied each of these requirements, are questions for a jury to decide.

850 So. 2d 555, 560 (Fla. Dist. Ct. App. 2003).

## III.    Analysis

### A.    Bad Faith Claims (Counts 1 & 2)[10]

As set forth above, although an insurer may settle certain claims to the exclusion of others in multiple claim cases, the decision to do so must be reasonable and made in good faith.   *See Mesa*, 799 F.3d at 1359.   The undersigned recommends that Columbia has failed to meet its initial burden to show the absence of material factual issues regarding whether it acted in good faith in settling Mrs. Tennant's consortium claim for nearly $1 million, particularly when that settlement ended Columbia's defense obligations and left the insured

---

[10] Because the same standard applies to Plaintiff's common law and statutory bad faith claims, the undersigned addresses them collectively herein.

without primary coverage for the remaining claims.  *See Clark*, 929 F.2d at 608.
Moreover, even if Columbia has met that burden, National has sufficiently shown
that there are material factual issues for trial.

The crux of Columbia's argument is that it is undisputed that it could not
settle all of the claims, or even Mr. Tennant's claim, within its policy limits.  (Doc.
38 at 9–12.)  Thus, Columbia contends that its decision to settle the next most
valuable claim comports with its duty to settle as many claims as possible to reduce
potential excess verdicts against its insureds.  (*Id.* at 7, 12–15.)  The fallacy in
Columbia's argument is apparent by its following statement: "There was no
opportunity to achieve a different outcome as the Plaintiff herein contends, since
[the Tennants' attorney, Daniel Iracki, Esq.,] confirmed in his testimony that all
claims could not have been settled."  (*Id.* at 19.)  However, a "different outcome"
could have been achieved through trial, if necessary.  There was no requirement
that Columbia had to settle any claim if it could not reasonably do so.  Instead, its
duty was to *not* "indiscriminately" settle but rather to reasonably minimize its
insured's exposure even if that meant a settlement could not be achieved.  *See
Farinas*, 850 So. 2d at 560.  The undersigned recommends that whether Columbia
complied with this duty is a jury question.

In support of its position that it acted in good faith and the settlement was
reasonable, Columbia cites only the deposition testimony of Mr. Iracki and Preston

10

Burroughs, Columbia's adjuster who handled the Tennants' claims and made the settlement decision.  (Doc. 38 at 12–15.)  The undersigned recommends that this testimony, which a jury might reasonably view as biased and/or self-serving, is insufficient to meet Columbia's initial burden of establishing the lack of a genuine factual issue regarding good faith.

Mr. Iracki testified in relevant part as follows:

> Q. You think [Mrs. Tennant's] consortium claim exceeded [$2 million]?
>
> A.  Yes.
>
> Q.  Why do you think that, sir?
>
> A.  Because of the severity of the injuries suffered to her husband who had a traumatic brain injury, no longer employed and he just had a myriad of problems associated with that.
>
> . . .
>
> Q.  What do you remember about Mrs. Tennant?
>
> A.  Mrs. Tennant at the beginning was the one who took the brunt of -- you know, so he had a traumatic brain injury in his left frontal lobe and the problem with that is it affects his emotions, his coping mechanisms and he would have uncontrolled outbursts, he would have emotional issues where, you know, milk would spill and he would literally cry.
>
> . . .
>
> Q.  Tell us a little about that.  Why is [the impression a client will make on a jury] important?

11

A.  Well, it's important because if the jury -- for one, the jury has to believe your client.  But, two, particularly in Mrs. Tennant's case, is their likability and would the jury relate to them and the jury understand what they have experienced and what they will experience the rest of their life and she -- we rate them on a scale A to D, A to F, and it was my impression that she was an A witness, that a jury would -- that she'd be very appealing to a jury, that she was a good historian as to what has happened.  She was a good witness.  She was a good plaintiff.

(Doc. 38-14 at 25–27.)

Mr. Burroughs testified in relevant part as follows:

Q.  Tell me why the decision was made to pay Stephanie Tennant the roughly million dollars.

A.  . . . [B]ecause of what she was having to go through because of her husband's alleged brain injury, I thought she had a very substantial loss of consortium claim, and I thought we could get -- we would take a run at that and see if we could settle it within my policy limits.  And, of course, that is based on her husband's loss of income; the mental and physical abuse that she allegedly had to sustain from her husband following this accident; the fact that she was a 27-year-old, attractive woman, two small kids, recently married.  Should have been on top of the world, and then all of the sudden it seemed like the weight of all the world was placed on her shoulders, where she was having to tell her husband . . . to wash his private parts when he took a bath, you know, things like that.  I thought a jury could easily see her claim being worth well more than what I had in available coverage.

. . .

Q.  And based on the amount of the verdict, which was for the husband for less than a million dollars, do you still

believe that paying the million dollars on Stephanie Tennant's claim was the appropriate thing to do?

A. I do, and I'm going to tell you why. I don't know what happened with the discovery and investigations that took place after I settled with Mrs. Tennant. Based on my evaluation of the case's potential at the time that we did have the settlement, I do -- I do believe her claim had a value in excess of my policy limits. I also believe that not having Mrs. Tennant's name on that -- on that jury form, I believe it was very helpful to the trial because she was so terribly sympathetic. I believe what I did was proper and -- I believe what I did was proper. I believe that was the right thing to do at that point in time.

(Doc. 38-15 at 3–4, 18–19.)

The undersigned recommends that although a reasonable jury might accept this opinion testimony from Mr. Tennant's attorney and Columbia's adjuster as adequate to discharge Columbia's duty of good faith, it might not. This testimony alone does not establish as a matter of law that Columbia complied with its duty of good faith. Moreover, even if this testimony was sufficient to satisfy Columbia's initial burden, the undersigned further recommends that, viewing the evidence in the light most favorable to National, material issues of fact are presented.

Although Columbia emphasized Mrs. Tennant's apparent sympathetic demeanor, as well as the apparent deterioration of her marriage and abuse following the accident, there are many more pertinent facts and circumstances. First, it appears the value of Mrs. Tennant's claim was largely dependent upon the value of Mr. Tennant's claim. As set forth above, there were numerous highly

13

contested issues in the underlying suit regarding liability, causation, and damages for all claims.  (*See generally* Docs. 38-5 & 38-7.)  Specifically, Mr. Tennant may have been largely, if not completely, at fault for the accident (a witness indicated that he sped up rather than slowed down to avoid the collision, and he was not wearing a seatbelt); he may not have been injured in the accident (he refused treatment at the scene and first responders indicated that he was not injured); and his psychological/behavioral problems may have preceded the accident and not been the result of the alleged brain injury (there was at least some evidence indicating he had a prior criminal history, he was purportedly violent and abusive towards his two ex-wives, and he may have been addicted to prescription medications).[11]  (*See* Doc. 38-5 at 2–3; Doc. 38-7 at 5, 9, 18–19; Doc. 45-1 at 100–01.)  Given these and other apparent weaknesses in Mr. Tennant's claim, the decision to settle Mrs. Tennant's claim for nearly $1 million cannot be said to be reasonable and in good faith as a matter of law.

Next, even if Mr. Tennant was awarded substantial damages, the jury would likely have evaluated the circumstances regarding the Tennants' marriage in considering her damages.  The following background facts might have been pertinent.  This was Mr. Tennant's third marriage, and it was at least the second

---

[11] To the extent any evidence cited herein was not discovered until after the settlement was completed, this may be relevant to the additional factual issue whether Columbia reasonably investigated the claims before settling.

marriage for Mrs. Tennant.  (Doc. 38-7 at 11; Doc. 44-4 at 50.)  At the time of the accident, the Tennants had been married for less than three months. (*See* Doc. 38-7 at 32.)  Mr. Tennant was 40 years old and had one adult child from a prior relationship.  (*See id.* at 3, 11.)  Mrs. Tennant was 27 years old and had one child from a prior marriage.  (Doc. 44-4 at 50.)  Mr. and Mrs. Tennant also had one child together before they were married.  (*See id.* at 49; Doc. 38-7 at 11, 32.)  There were indications that before Mrs. Tennant's claim was settled, she and Mr. Tennant had separated, she was contemplating filing for divorce, and she may have been having an affair.  (Doc. 38-7 at 29, 32, 34, 48; Doc. 45-1 at 103–05.)  Although the Tennants apparently attributed these circumstances to the accident, both of Mr. Tennant's ex-wives described him as a "psycho," and both accused him of domestic abuse.[12]  (Doc. 38-5 at 4.)  If admitted, such or similar evidence would likely have cast additional doubt on the claim that the accident was the cause of any abuse of Mrs. Tennant by Mr. Tennant.  Additionally, Ms. Fallin, the defense attorney retained by Columbia, valued Mrs. Tennant's claim at between $35,000 and $750,000 at around the time the settlement offer was accepted in October 2017.  (*See* Doc. 45-1 at 63–65; Doc. 38-11.)  In short, a reasonable jury might conclude that Columbia's claim evaluation was flawed and not in accordance with

---

[12] For example, Ms. Fallin testified that one ex-wife was afraid to talk to her because she feared for her life if she testified against Mr. Tennant, and a second ex-wife stated that Mr. Tennant had tried to throw her out of a moving car.  (*See* Doc. 45-1 at 100–01.)

15

its duty of good faith.

The foregoing discussion is not meant to indicate that Columbia acted in bad faith or that its settlement with Mrs. Tennant was unreasonable.  It is meant only to show that a jury issue is presented.  Therefore, the undersigned recommends that the Motion be denied as to Counts I and II.

### B.   Punitive Damages Claim (Count III)

In Count III, Plaintiff seeks punitive damages pursuant to Section 624.155(5), Florida Statutes, which states in relevant part:

> No punitive damages shall be awarded under this section unless the acts giving rise to the violation occur with such frequency as to indicate a general business practice and these acts are:
>
> (a) Willful, wanton, and malicious; [or]
>
> (b) In reckless disregard for the rights of any insured . . . .

Regarding punitive damages under this section:

> In a bad faith cause of action, a plaintiff may not recover punitive damages unless the acts giving rise to the violation occur with such frequency as to indicate a general business practice . . . .  To prove the existence of a general business practice, the plaintiff must demonstrate other acts of bad faith by the insurer that are unrelated to the insurance claim at issue in the underlying action.   Typically, a plaintiff establishes a general business practice by demonstrating that the insurer also acted in [bad] faith when evaluating numerous other claims.

16

*Fox Haven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, Case No. 2:13-cv-399-FtM-29CM, 2015 WL 667935, at *6 (M.D. Fla. Feb. 17, 2015) (citations and quotations omitted).   For the reasons set forth below, the undersigned recommends that the Motion be granted as to Count III.

Columbia argues that summary judgment is appropriate as to Count III because there is no evidence of record suggesting that it engaged in the conduct at issue with such frequency as to indicate a general business practice.  (Doc. 38 at 23–24.)  It also notes that National's own employees and expert conceded in their depositions that they had no knowledge of any such practice.  (*Id.*)  Donald Nikolas, National's adjuster who handled the Tennants' file, Elizabeth Henson, National's corporate representative, and Peter Hildebrand, National's expert, all testified that they had no knowledge of how Columbia handled other claims or its general business practices.  (*See* Doc. 38-18 at 36; Doc. 38-17 at 11; Doc. 38-19 at 99.)

In the Response, National fails to even address its claim for punitive damages or Columbia's arguments regarding the same, and it cites no evidence to rebut the evidence cited by Columbia.  Thus, the undersigned recommends that summary judgment be granted as to Count III.  *See Fox Haven*, 2015 WL 667935, at *6–7 (denying in part defendant's motion for summary judgment as to the

17

plaintiff's bad faith claim but granting summary judgment as to the plaintiff's claim for punitive damages).

## IV.   Conclusion

Accordingly, it is respectfully **RECOMMENDED** that:

The Motion (**Doc. 38**) be **DENIED** as to Plaintiff's bad faith claims (Counts I and II) and **GRANTED** as to Plaintiff's claim for punitive damages (Count III).

**DONE AND ENTERED** at Jacksonville, Florida, on May 21, 2020.


JOEL B. TOOMEY
United States Magistrate Judge




Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record

18